

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-2002

# Warren v. Reading Sch Dist

Precedential or Non-Precedential:

Docket 0-1148

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Warren v. Reading Sch Dist" (2002). *2002 Decisions.* Paper 26.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/26

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 23, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1148

ROBERT WARREN, A MINOR, BY AND THROUGH LORI
A. GOOD, HIS PARENT AND NATURAL GUARDIAN

v.

READING SCHOOL DISTRICT; GERALDINA SEPULVEDA,
IN HER INDIVIDUAL AND OFFICIAL CAPACITY AS
PRINCIPAL OF THE 10TH AND GREEN ELEMENTARY
SCHOOL; JAMES A. GOODHART, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITY AS SUPERINTENDENT OF THE
READING SCHOOL DISTRICT

          Reading School District,
              Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
Civil Action No. 97-cv-4064
District Judge: Hon. J. Curtis Joyner

Argued: December 4, 2000

Before: McKEE, ROSENN and CUDAHY,*
Circuit Judges

(Opinion Filed: January 23, 2002)

_____
* The Honorable Richard D. Cudahy, Senior Judge for the United States
Court of Appeals for the Seventh Circuit sitting by designation.

DAVID R. DAUTRICH, ESQ. (Argued)
526 Court Street
Reading, PA 19601

Attorney for Appellee

FREDERICK B. BUCK, III, ESQ.
 (Argued)
Rawle & Henderson
1339 Chestnut Street
16th Floor
Philadelphia, PA 19107

Attorney for Appellant

OPINION OF THE COURT

McKEE, Circuit Judge.

Lori Good brought this action on behalf of her minor son, Robert Warren, seeking damages under Title IX for sexual abuse he received at the hands of his fourth grade teacher in a school that was part of the defendant school district. Plaintiff also contends that the school's principal was individually liable for damages under 42 U.S.C.S 1983. The jury returned a verdict against the school district under Title IX, but found the principal was not liable under S 1983. The district court refused to grant a renewed defense motion for judgment as a matter of law or grant a new trial, and awarded plaintiff attorney's fees. This appeal followed. For the reasons set forth below, we will reverse and remand for a new trial on plaintiff 's Title IX claim.

I. FACTUAL BACKGROUND

In April 1995, Robert Warren transferred into the Reading School District's Tenth and Green Elementary School where he was assigned to Harold Brown's fourth grade class. At some point after Robert's transfer, Robert remained after school at Brown's request. While Robert remained in the classroom, Brown locked the classroom door, and asked Robert to play a "game" that Brown called "shoulders." This consisted of Robert squatting with his

2

head between Brown's legs and placing his shoulders under Brown's thighs. Robert would then lift Brown's upper body from this squatting position as Brown leaned forward. As Robert lifted, Brown's genitals touched the back of Robert's head and neck. Brown challenged Robert to squat and lift as many times as he could and Brown "rewarded" Robert with candy or money when the "game" was over. Brown apparently repeated this routine two or three times per week during the school year. On at least one occasion during the following summer, Brown also drove by Robert's house in order to pick Robert up and take him to a"secret spot" near the woods where they again played"shoulders."

In early November 1995, Lori Good discovered her son's journal and read an entry in which Robert described playing "shoulders" with Brown at a secret spot. Good immediately became concerned and spoke to Robert about the entry. After that discussion, Good reported Brown's conduct to the Berks County Children and Youth Services. That agency reported Brown's suspected abuse to the school district, and Brown was suspended, and ultimately resigned his position.[1]

A short time later, Good initiated a civil rights action under 42 U.S.C. S 1983 seeking damages from the Reading School District, Dr. Sepulveda, the principal of Tenth and Green Street School; and Dr. James A. Goodhart, the former superintendent of the Reading School District. The suit included a state law claim against Sepulveda and Goodhart under 42 Pa. C.S.A. S 8550. Good subsequently amended the complaint to add a private cause of action for damages against the school district under the Education Amendments of 1972, 20 U.S.C. S 1681 et. seq. (Title IX).

The district court granted summary judgment in favor of the defendants and against Robert on all claims except the Title IX claim against the school district and theS 1983 claim against Sepulveda. Those claims proceeded to trial.

_____

1. The briefs of the parties confirm that Brown surrendered to authorities and was thereafter arrested on three criminal complaints detailing sexual abuse of several male students. He was thereafter prosecuted in the Court of Common Pleas of Berks County. Commonwealth of Pennsylvania v. Harold Brown, Criminal Nos. 1677/96, 973/96, 2107/96.

Carlos Mercado testified at trial for the plaintiff. Mercado's son had been a student at Tenth and Green Elementary School in the early 1990s. Mercado testified that he went to that school sometime in 1992 or 1993 and spoke with Sepulveda regarding his concerns about Brown engaging in inappropriate activity with his son. The following exchange occurred during Mercado's testimony:

> Q: And what did you say to the principal that day, Mr. Mercado?
>
> A: I told her that I wanted to talk to her about Mr. Brown taking my kid to his house, that there's no reason for him to take him to his house and give him money to lift him up and down. She told me that she was too busy to listen to me at that time. She told me to talk to Mr. Vecchio [the guidance counselor].

* * *

> Q: Did you talk to Mr. Vecchio?
>
> A: Yes. . . . I told him -- she told me to go to him, so I went to him. He said what was the problem. I told him that I wanted to talk to him about Mr. Brown taking my kid to his house and lifting him up and down and giving him money. There was no reason for that.
>
> Q: Mrs. Sepulveda, did she stay at the office?
>
> A: No, she walked out.

Appendix at 129-30.

Mercado testified that Vecchio said he was going to talk to Brown and "get back to me," but Mercado never heard anything further from Vecchio, Sepulveda, or anyone else at the school. According to Mercado, Sepulveda appeared to be in a hurry, and upset about something when he tried to speak to her. He testified: "I couldn't describe it to the lady because she was too much in a hurry. She was going out." Id. at 139-40. Vecchio and Sepulveda also testified, but they both denied having any such conversation with Mercado.

Plaintiff also introduced the testimony of Dr. Susan Kraus, an expert in psychology and sexual abuse of

4

children. She testified that the "shoulders" game that Robert described was actually a masturbatory exercise engaged in for sexual gratification. According to her testimony, "games" such as this are nothing more than sexual activity. They did not constitute anything that could be regarded as "horseplay."

Dr. Chester Kent also testified for plaintiff over the defendants' objection. Kent was an expert in the field of school policy, procedure and administration, with a subspecialty in cases involving molestation or abuse of children. He opined that the Dr. Sepulveda's internal policies for student safety were highly deficient and not conducive to protecting the health, safety, or welfare of the students at the school. App. 231, 239, 243, 250-1. He also surmised that, given the number of children that had been victimized by Brown, the level of activity in Brown's classroom should have aroused suspicion. He added that Sepulveda was complacent and her approach to protecting the welfare of the children at her school conveyed that complacency to the teachers she was responsible for supervising. According to him, those teachers "were certainly incapable of recognizing the signs that they should have recognized when something was not right regarding molestation of students." App. 250-1. Kent concluded that Sepulveda's attitude evidenced deliberate indifference as exemplified by her response to the Mercado complaint. Id. He testified:

> throughout [Sepulveda's] tenure, beginning with the Mercado incident, she basically conducted no investigations of any type to determine if there was a legitimate complaint involved. This becomes very, very important because one could always say, I've turned it over to the police or I turned it over to Children and Youth Services. but the police standard is much higher. . . . School Districts are required to conduct an investigation to determine whether or not a person is fit to be a teacher. None of that has ever gone on under her leadership in the building

App. 251-2. Later in his testimony, Dr. Kent told the jury that Dr. Sepulveda's attitude "really served to create a hostile environment in the building where young boys. . .

5

became prey of a teacher who was bent on molesting them and this was happening right under the nose of the principal." App. 257.

Plaintiff also introduced two "supervisory conference" memoranda over defense objection. The first memorandum, dated 1969, was a two-page evaluation of Brown that had been prepared years before he came to Robert's school. The memorandum summarized the conference Brown apparently had with a supervisor back in 1969. It stated in part: "[w]e also discussed his preparation for graduate school-- children in his class-- and his involvement with children after school hours." Warren v. Reading School Dist., 82 F. Supp. 2d 395, 398 (E.D. Pa. 2000). The memorandum was in Brown's personnel file in the School District Administration Building, but there was no evidence that Sepulveda, or anyone else at Robert's school ever saw it or knew it existed.

The second memorandum was a supervisory conference memorandum that Sepulveda prepared in 1995. It stated in part: "it has been brought to my attention that the games you play with the students in the classroom involve physical contact. For the best interest of all concerned, this situation must `stop'." Id. Sepulveda explained that this second memorandum referred to a parent's complaint that inappropriate "horseplay" was occurring in Brown's classroom during recess and not inappropriate sexual or physical contact.

At the close of plaintiff 's case, the school district moved for judgment as a matter of law under Fed. R. Civ. P. 50. The school district argued that plaintiff had not introduced sufficient evidence to allow a reasonable jury to conclude that an official of the Reading School District had actual knowledge of, and was deliberately indifferent to, Brown's conduct as was required under the standard recently articulated in Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998). Sepulveda also moved for judgment as a matter of law arguing that the evidence was insufficient to impose S 1983 liability on her under Stoneking v. Bradford Area School District, 882 F.2d 720 (3d Cir. 1989). The court denied both motions, and the jury returned a verdict against the school district under Title IX

6

in the amount of $400,000. The jury's interrogatories established that the jury found that a school district official with authority to institute corrective measures had actual notice of Brown's conduct and acted with deliberate indifference. However, the jury also found for principal Sepulveda and concluded that she was not individually liable under S 1983.

The school district filed timely motions for judgment as a matter or law, or in the alternative, for a new trial, under Fed. R. Civ. P. 50(b) and 59. The district court denied both motions, entered judgment against the school district, and awarded plaintiff $104,000 in attorney's fees under 42 U.S.C. S 1988. This appeal followed.

The school district raises several claims of error. However, we will limit our discussion to the district's claim that the court erred in not instructing the jury that Vecchio could not be considered "an appropriate person" under Title IX. Inasmuch as we conclude that the school district is entitled to a new trial on that basis, the remaining claims of error are moot.2

II. JURISDICTION AND STANDARD OF REVIEW

The district court had subject matter jurisdiction over plaintiff 's federal claims pursuant to 28 U.S.C.S 1331. We have jurisdiction under 28 U.S.C. S 1291. Our review of the district court's denial of the Rule 50(b) motion is plenary.
_____

2. We do, however, note our concern with admitting the 1969 conference memorandum as this may become an issue at any subsequent retrial. The district court concluded that the memorandum"was not unfairly prejudicial," and allowed it into evidence. Warren 82 F. Supp. 2d at 401. We do not disagree with the court's assessment of the note's minimal potential for prejudice. However, its contents are so nebulous that only the rankest kind of speculation can connect it to anything relevant to Title IX. See P.H. v. School District of Kansas City, 265 F.3d 653, 660 (8th Cir. 2001) (an "isolated complaint that was nearly 20 years old at the time of [the] abusive conduct . . ." was not "itself a sufficient basis
on which to infer that the [defendant school district] had notice of the improper sexual contact . . ."). Furthermore, the memorandum is unsigned, the author uncertain, and the record is silent as to who attended the conference from which it allegedly emanated.

7

Accordingly, we will reverse "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Fultz v. Dunn, 165 F.3d 215, 218 (3d Cir. 1998). We review the district court's order denying a new trial for abuse of discretion, unless the court's decision is based upon the application of a legal precept. If that is the case, our review is plenary. Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 (3d Cir. 2001).

III. DISCUSSION

A. LIABILITY UNDER TITLE IX, 20 U.S.C. S 1681 et seq.

Title IX of the Education Amendments of 1972 provides in pertinent part:

> No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. S 1681(a). Although Congress only provided for administrative enforcement of Title IX's prohibition against discrimination, the Supreme Court held in Cannon v. University of Chicago, 441 U.S. 677 (1979), that Title IX is also enforceable through an implied private right of action. Thereafter, in Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992), the Court held that monetary damages can be recovered in a private action under Title IX. However, the Court did not define the parameters of that liability until it decided Gebser, supra.

Gebser concerned an implied private cause of action for damages resulting from sexual harassment of a student by a teacher. Waldrop, who was the teacher, began making "sexually suggestive comments to students," and eventually initiated sexual contact with the minor plaintiff while visiting her home "ostensibly to give her a book" while her parents were away. Id. at 277-8. Waldrop's advances

8

escalated to a sexual relationship which he maintained with the plaintiff student who was assigned to his classroom.

Gebser never reported Waldrop's conduct. Parents of two other students did complain to the high school principal. However, those parents only knew of Waldrop's improper class room comments, and that was the substance of their complaints to the school principal. The principal responded by arranging a meeting between himself, the parents who had complained, and Waldrop. During that meeting, Waldrop stated that he did not believe any of his remarks were offensive, but he nevertheless apologized for them. The principal responded by cautioning Waldrop about his class comments, and later informing the school's guidance counselor about the meeting. However, the principal did not inform the district superintendent (who was also the district's Title IX coordinator) about the meeting.

Waldrop's relationship with Gebser was discovered a couple of months later when police encountered them having sexual intercourse. They arrested Waldrop, and the school district immediately terminated him. Thereafter, Gebser's parents brought an action against the school district that included a claim under Title IX, and 42 U.S.C. S 1983. The district court rejected the Title IX claim because it concluded that Title IX did not support liability in the absence of a policy, custom or a course of conduct that amounted to a custom or policy allowing discrimination or harassment. The court reasoned that plaintiff had to show actual knowledge of discrimination, and a failure to respond in good faith to establish such a policy. 524 U.S. at 279. Inasmuch as the evidence established that the school district only knew of parents' complaints about Waldrop's improper comments, the court held that the evidence was not sufficient to establish actual or constructive knowledge of a sexual relationship with Gebser. Accordingly, the court awarded judgment in favor of the defendant school district on the Title IX claim, and the Court of Appeals for the Fifth Circuit affirmed. Doe v. Lago Vista Independent School Dist., 106 F.3d 1223 (1997).

On appeal, the Supreme Court was asked to decide "when a school district may be held liable in damages in an implied right of action under Title IX." 524 U.S. at 277. The

Court rejected employer liability based upon principles of agency that apply in suits for sexual harassment under Title VII. The Court reasoned that "it would frustrate the purpose of Title IX to permit monetary damages for a teacher's sexual harassment of a student based on principles of respondent superior or constructive notice." Gebser, 524 U.S. at 285, citing Franklin, 503 U.S. at 71. Instead, the Court concluded that Title IX's "express remedial scheme is predicated upon notice to an appropriate person and an opportunity to rectify violation." Gebser, 524 U.S. at 290 (internal quotation marks omitted).

The Court explained that liability in damages could not attach under Title IX unless an "appropriate person" had actual notice of the conduct that liability is premised upon, and explained that:

> [a]n "appropriate person" under [Title IX] is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

Gebser, 524 U.S. at 290.

Although the Court did not explicitly state whether a school principal can be an "official" or "appropriate person" under Title IX, we think it is obvious from the Court's discussion that knowledge of a principal can be sufficient in an appropriate case. The only official with information about the teacher's misconduct in Gebser was the principal. The Court examined his actual knowledge and concluded that it was not sufficient for liability under Title IX. Gebser, 524 U.S. at 291-92. The Court noted that

> [t]he only official alleged to have had information about Waldrop's misconduct is the high school principal. That information, however, consisted of a complaint from parents of other students charging only that

10

> Waldrop had made inappropriate comments during
> class, which was plainly insufficient to alert the
> principal to the possibility that Waldrop was involved
> in a sexual relationship with a student.

524 U.S. at 291. The Court's analysis suggested the possibility that the principal could be "an appropriate person" under Title IX if plaintiff could establish the principal actually knew about the conduct and was deliberately indifferent towards it.

The Court's analysis in Gebser rested upon the supposition that a principal is usually high enough up the bureaucratic ladder to justify basing Title IX liability on his or her actual knowledge and deliberate indifference. If a principal is not an "appropriate person" for purposes of Title IX, a substantial portion of the Supreme Court's analysis in Gebser was nothing more than a meaningless discussion. See also Davis Monroe County Bd of Educ., 526 U.S. 629 (1999) (holding that principal's actual knowledge and failure to respond would support liability under Title IX); and Murrell v. School Dist. No. 1, Denver, Colo, 186 F.3d 1238, 1247 (10th Cir. 1999) ("We find little room to doubt that the highest-ranking administrator [at the school] exercised substantial control of Mr. Doe and the school environment during school hours, and so her knowledge may be charged to the School District.").

Moreover, the practical result of holding that a principal is not an "appropriate person" would require a plaintiff to prove that members of the school's governing body, perhaps even a voting majority of those members, knew of the improper conduct. That would undermine the private cause of action under Title IX that the Court found in Cannon, and eliminate the protection Congress intended for students in schools receiving Title IX funds.

In concluding that the private cause of action under Title IX was not identical to the cause of action under Title VII, the Court in Gebser stressed the different purposes of those two statutes. The explicit cause of action in Title VII is intended to punish acts of discrimination, whereas the cause of action in Title IX is intended as protection for the student. See Gebser, 524 U.S. at 287 ("Title IX focuses

11

more on `protecting' individuals from discriminatory practices carried out by recipients of federal funds."). The Court was therefore concerned that an implied right of private action not interfere with the opportunities for voluntary compliance built into the statutory scheme of Title IX, and administrative remedies that Congress included in the statutory scheme. Holding a school district responsible for actions of a principal fixes responsibility at sufficiently high level to afford the recipient of Title IX funds an opportunity to respond to claims of discrimination before funds are jeopardized by a teacher's conduct. It also affords an opportunity for voluntary compliance with the contractual undertakings that are part of Title IX funding. Gebser, 524 U.S. at 288. ("Presumably, a central purpose of requiring notice of the violation `to the appropriate person' and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute corrective measures.").

The Supreme Court in Gebser recognized the practical problems confronting plaintiffs attempting to establish a valid claim under Title IX, as well as the increasing difficulty of providing educational benefits in the face of growing claims of sexual harassment. The Court noted:

> The number of reported cases involving sexual harassment of students in schools confirms that harassment unfortunately is an all too common aspect of the educational experience. No one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher, and that the teacher's conduct is reprehensible and undermines the basic purposes of the educational system. The issue in this case, however, is whether the independent misconduct of a teacher is attributable to the school district that employs him under a specific federal statute designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner. . . . [W]e will not hold a school district liable in damages under Title IX for a teacher's sexual harassment of a student absent actual notice and deliberate 293 indifference. . . .

12

524 U.S. at 292.

The school district argues that since Gebser did not specifically "identify by job title those officials whose actual knowledge of a teacher's misconduct may be imputed to the school district," there remains an incomplete and vague standard as to who may qualify as an "appropriate person," and the question remains subject to interpretation. Appellants' Br. at 26. We disagree. For the reasons we have just discussed, we think that a school principal who is entrusted with the responsibility and authority normally associated with that position will ordinarily be"an appropriate person" under Title IX.3

Having reached that conclusion, however, we must still determine if the evidence here was sufficient to allow a reasonable jury to conclude that "an appropriate person" had actual knowledge of Brown's abuse of Robert. If we conclude that it was, we must then determine if the evidence allowed the jury to conclude that the "appropriate person" exhibited the deliberate indifference necessary to liability under Title IX.

B. PLAINTIFF ESTABLISHED ACTUAL KNOWLEDGE
OF "AN APPROPRIATE PERSON."

Plaintiff attempted to prove that both Sepulveda and Vecchio knew of Brown's conduct and the district court accepted the argument that each was "an appropriate person" under Title IX. On appeal, the school district

_____

3. The court in Miller v. Kentosh 1998 WL 355520 (E.D. Pa.) referred to the school principal as an appropriate supervisory official for the purposes of Title IX liability. Moreover, in Massey v. Akron City Board of Education, 82 F.Supp. 2d 735, 744 (N.D. Ohio 2000), the district court found that the school principal, who was the supervisor of a teacher who allegedly sexually harassed multiple students, was an official who had the authority to institute corrective measures against the teacher. Similarly, in Canty v. Old Rochester Regional School District, 66 F.Supp.2d 114 (D. Mass. 1999), summary judgment was dismissed in a case where the building principal, deemed an appropriate person under Gebser, failed to remedy the misconduct when he admittedly had knowledge of it.

13

argues that neither is "an appropriate person," and plaintiff persists in arguing that they both are.

The district court concluded that Sepulveda was "an appropriate person" and that she transferred her authority to Vecchio. The court also concluded that even if Vecchio was not "an appropriate person," plaintiff is not entitled to a new trial because the weight of the evidence established liability based only upon Sepulveda's authority. Warren v. Reading School Dist., 82 F. Supp. 2d 395, 401 (E.D. Pa. 2000). Although we agree that the evidence was sufficient to allow a reasonable jury to conclude that Sepulveda was "an appropriate person" under Title IX, we do not agree that Vecchio was, or that Sepulveda somehow transferred her authority to Vecchio.

Dr. Sepulveda testified that she had a doctorate degree in education administration and supervision. App. 414. She also testified that, as principal, she was in charge of every aspect of the daily operations of the Tenth and Green Elementary School, including supervision and discipline of the teachers at the school. Id. at 414–17. She was responsible for the health, safety, and welfare of the students at her school. Id. She testified that she enacted, oversaw, and administered numerous school programs including the latch-key program, migrant program, detention program, homework program, and dismissal program. Id. She had also been responsible for planning agendas for faculty-wide meetings during which she instructed teachers on various district policies including sexual harassment. Her duties included administrative responsibility for educating teachers about sexual harassment policies. Id. at 426–28, 442. Her responsibilities for supervising teachers obviously included the kind of reprimand contained in the supervisory conference note mentioned above wherein she rebuked Harold Brown for his activities with children. As noted above, that note stated in part: "it has been brought to my attention that games that you play with students in the classroom involve physical contact. For the best interest of all concerned, this situation must `stop.' " App. 249 (emphasis added).

Moreover, Dr. Kent's testimony stressed the importance of the wording of that note. He believed it was very

14

uncommon for a principal to write such a pointed note and place it in a personnel file. Kent opined that it meant that Sepulveda was trying to "send a very strong message. They did not want this behavior to continue." App. 250. The date of this note, October 24, 1995, is after Brown's last contact with Robert, and only 10 days before Brown was suspended. Therefore, it did not conclusively establish Sepulveda's knowledge of Brown's conduct. Moreover, Sepulveda explained that the note was written in response to parental complaints about "horseplay" in Brown's room during recess, and not about the "shoulders" activity, or anything like it. See Warren v. Reading School Dist., 82 F.Supp. 2d at 398. Assuming arguendo that the jury accepted that explanation, the note is still highly probative of Sepulveda's authority in the school.4 It certainly corroborated the plaintiff 's contention that she was "an appropriate person" with "authority to institute corrective measures on the district's behalf." Gebser , 526 U.S. at 277.

The district court held that Sepulveda had supervisory authority "to institute corrective measures on the district's behalf," within the meaning of Gebser. 82 F. Supp. 2d at 400. Although Sepulveda, might not have authority to terminate or even suspend a teacher under Pennsylvania law, she acknowledges that she had authority to investigate a teacher's misconduct. The authority to supervise a teacher and to investigate a complaint of misconduct implies the authority to initiate corrective measures such as reporting her findings to her superior or to the appropriate school board official at the very least. We therefore agree with the district court that Dr. Sepulveda is an official with authority to institute corrective measures on the School District's behalf. Moreover, the October 24 memorandum is certainly consistent with the kind of authority necessary to finding that she was "an appropriate person" under Gebser.

We also agree that the evidence would support a finding that Sepulveda knew of Brown's conduct and was deliberately indifferent to it. Mercado's testimony alone

_____

4. Although this assumption is contrary to our standard of review, it illustrates the force of plaintiff 's evidence.

15

would support a jury finding that Sepulveda had been told that a teacher in her elementary school was taking a student to that teacher's home, and paying the student to engage in physical activity consisting of "lifting up and down." She responded by telling Mercado that she was "too busy" to listen to this parent's complaint, or act upon it. She referred Mercado to Vecchio, a guidance counselor. The jury could find deliberate indifference from that testimony alone, even absent Kent's expert assessment of it. 5

However, as noted above, plaintiff also argues that the evidence would allow the jury to conclude that Vecchio was "an appropriate person" as well. Vecchio testified that his job involved dealing with children who have behavioral as well as academic problems, and referrals to networks of agencies that provide assistance to children and families. App. 401. He also handled referrals for abuse, and assumed the role of principal when Sepulveda was not in the building. However, when Mercado visited Tenth and Green Elementary School to complain about Brown's conduct Sepulveda was present. Nothing suggests that Vecchio was acting as principal then except for the argument that arises from Sepulveda referring Mercado to Vecchio because she was "too busy" to listen. That is not sufficient on this record to visit liability upon the school district. Although a principal can be "an appropriate person," there is clearly insufficient evidence on this record to allow a jury to conclude that Vecchio was cloaked with sufficient authority to be a "responsible person" during any time relevant here.

The case was submitted to the jury under a theory that allowed it to find that either Sepulveda or Vecchio was "an appropriate person." Moreover, during jury deliberations, the jury asked whether the guidance counselor was"an appropriate person." The court rejected the school district's

_____

5. We realize that Mercado testified that Sepulveda was in a hurry and appeared distracted when he spoke to her. However, that is not inconsistent with deliberate indifference. Rather, testimony that a school principal was too busy to respond to a parent's report that a teacher was taking a student to that teacher's home and paying him for some kind of physical activity involving "lifting up and down" could only have confirmed Sepulveda's indifference.

16

request that the jury be instructed that Vecchio was not "an appropriate person" as a matter of law. Rather, the court concluded that Vecchio's status under Gebser was a fact question, and instructed the jury that it should make its own determination based upon the evidence. App. 616–618. The school district argues that was error that entitles it to a new trial. We agree.

The court's response to the jury allowed the jury to return a verdict for plaintiff based upon Vecchio's knowledge and deliberate indifference rather than Sepulveda's. However, the district court's own opinion strongly suggests that the court did not believe that the plaintiff's Title IX claim could be based upon Vecchio's knowledge and indifference. The court's entire discussion of the jury's concern with Vecchio being "an appropriate person" is as follows:

> Defendant next argues that the Court erred when it declined to instruct the jury that Mr. Vecchio, a guidance counselor, was not an "official" of the Reading School District within the meaning of Gebser, The Court does not agree with Defendant that it is clear that Mr. Vecchio was not an appropriate official under Gebser when the principal, Dr. Sepulveda, had transferred her authority to Mr. Vecchio. But more importantly, even if Mr. Vecchio were not an appropriate official under Gebser, for the reasons discussed in Section One (I) above the jury's verdict would not be "contrary to the great weight of the evidence," nor would the jury's verdict "produce a result inconsistent with substantial justice." Therefore, Defendant's request for a new trial on this basis is denied.

82 F. Supp. 2d at 401 (internal citations omitted). 6 The court is careful to note that the school district could be liable based upon Vecchio's knowledge "when the principal . . . had transferred her authority to" him. Besides, such
_____

6. Section one of the opinion, which the court refers to, is the portion of
the court's analysis where the court convincingly discusses why Sepulveda's authority would support the school district's liability under Title IX.

authority could not have been transferred to Vecchio without school district approval, and there is none here. However, as we have already noted, this record does not support a finding that such authority was transferred (insofar as Title IX's "appropriate person" limitation is concerned) at any time relevant to this complaint. Sepulveda merely referred a complaint, she did not delegate authority or responsibility. Accordingly, we conclude that the district court erred in failing to instruct the jury that Vecchio could not be "an appropriate person" on this record.

Inasmuch as the jury's verdict slip does not allow us to determine if the verdict was based upon Vecchio's actual knowledge and deliberate indifference, or Sepulveda's actual knowledge and deliberate indifference, we must remand for a new trial on plaintiff 's Title IX claim as the school district has requested in the alternative. [7]

III. CONCLUSION

For the above reasons, we will affirm the district court's denial of the defendants' motion for judgment as a matter of law, but we will reverse the district court's denial of the

_____

7. The school district argues that the jury's verdict for Sepulveda on the S 1983 claim establishes that the jury found that Vecchio, and not Sepulveda, was deliberately indifferent under Title IX. Appellant's Br. at 38. Accordingly, the school district argues it is entitled to judgment as a matter of law on the Title IX claim. We do not think it appropriate to grant judgment as a matter of law, however, because the evidence supports a jury verdict on that claim if the verdict is based upon Sepulveda's authority, knowledge, and deliberate indifference. The school district requests a new trial on the Title IX claim in the alternative, and that relief is appropriate.

As noted above, plaintiff argues only that both  Vecchio and Sepulveda were "appropriate person[s]" for purposes of Title IX. He does not rely upon a possibly inconsistent verdict to argue that he should receive a new trial on the S 1983 if we order a new trial under Title IX. Accordingly, we need not discuss whether the apparent inconsistency in the verdicts could justify ordering a new trial on both claims as is sometimes proper under our the analysis in Mosley v. Wilson, 102 F.3d 85, 89-91 (3d Cir. 1996).

defendants' motion for a new trial and remand this matter
to the district court for further proceedings consistent with
this opinion.8

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

8. In light of our holding, we will instruct the district court to vacate its
award of attorney's fees for plaintiff. See Baumgartner v. Harrisburg
Housing Authority, 21 F. 3d 541, 544 (3rd Cir. 1994) (In order to receive
an award of attorney's fees under 42 U.S.C. S 1988 "a plaintiff must
receive at least some relief on the merits of his[/her] claim before
he[/she] can be said to prevail.").