Andrew MEDCALF,

v.

The TRUSTEES OF UNIVERSITY OF PENNSYLVANIA, Appellant.

No. 02–2861.

United States Court of Appeals, Third Circuit.

Argued Tuesday July 8, 2003.

Decided July 30, 2003.

---

4.  Kovalev filed a motion to stay deportation     in this Court, which we denied.

Neil J. Hamburg, Hamburg & Golden, P.C., Philadelphia, PA, Eric A. Tilles (argued), University of Pennsylvania, Office of the General Counsel, Philadelphia, PA, for Appellant.

Lawrence R. Woehrle (argued), Sprague & Sprague, Philadelphia, PA, for Appellee.

Before NYGAARD, SMITH, and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

SMITH, Circuit Judge.

## I. INTRODUCTION

This case results from efforts by the University of Pennsylvania ("Penn") to hire a coach for its women's crew program. Appellee Andrew Medcalf, a male, applied for the position of Women's Crew Coach. Penn interviewed several females for the position, but did not interview Medcalf or any other males; Barbara Kirch, a female, was the successful candidate. Medcalf filed an EEOC complaint against Penn, alleging reverse gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* After obtaining a right to sue letter from the EEOC, Medcalf filed suit in federal district court. Following a jury trial, the jury returned a verdict in Medcalf's favor, finding that gender had been a determinative factor in Penn's decision not to hire him, that he was entitled to $71,996 in lost wages and medical benefits, $18,130 for compensatory damages, and $25,170 in punitive damages. Penn filed a post-trial motion for judgment as a matter of law on November 9, 2001. The District Court denied Penn's motion, without opinion, on June 8, 2002, and Penn now appeals. We will affirm the judgment of the District Court.

## II. FACTS

Since we write only for the parties, who are intimately familiar with the facts of this case, we recite only those facts necessary for the disposition of this appeal. Because this is an appeal from a jury verdict, we view the facts in the light most favorable to the prevailing party, here Medcalf. *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir.2003). Andrew Medcalf was an Assistant Men's Crew Coach at Penn from 1991 to 1997, working primarily with the Men's Heavyweight Crew under the direction of Rowing Director Stan Bergman. In the spring of 1997, Penn sought to fill the position of full-time Women's Rowing Coach. Penn's Athletic Director, Steve Bilsky, testified at trial that he placed Senior Associate Athletic Director Carolyn Femovich in charge of conducting the search process "as she saw fit," although Bilsky did participate in interviews with the final candidates and was responsible for the ultimate hiring decision. Rowing Director Stan Bergman was also involved in recommending candidates to Bilsky.

In advertising the coaching vacancy, Penn placed a "Position Announcement" in numerous rowing publications. Femovich testified that she drafted the document, which identified the vacancy as an "assistant coach" position, and was "intended to be a general overview of the major responsibilities" of the coach. The first "actual duty" of the coach, as stated in the announcement, was to "direct[ ] and coach[ ] women's rowing, instruct[ ] team members in rowing techniques, train[ ] novices and advanced rowers in rowing tanks and on the water. Make[ ] boat selection for both Varsity and Junior Varsity." App. at 1705.

Penn received approximately twenty-five applications following the placement of its first Position Announcement, including those of Andrew Medcalf and Barbara Kirch. However, Penn decided that it wanted to attract a stronger, deeper pool of candidates, so it re-advertised the position as "Coach II—Women's Rowing," as opposed to an assistant coach position. Ultimately, fifty-four candidates applied for the position—thirty-four men and twenty women. Bergman recommended to Femovich and Bilsky that, based on his review of the applicants, Medcalf was the superior candidate of all of them. Femovich, who determined which applicants should be granted interviews, decided to interview four women and no men. In the end, Bilsky settled on Kirch.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over Penn's motion for judgment as a matter of law under Fed.R.Civ.P. 50(b). *Warren v. Reading School District*, 278 F.3d 163, 168 (3d Cir.2002). Accordingly, we apply the same standard as the District Court, examining whether, when "viewing the evidence in the light most favorable to [Medcalf] and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Id.* Reversal is only appropriate where "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Hopp v. City of Pittsburgh*, 194 F.3d 434, 439 (3d Cir. 1999).

## IV. ANALYSIS

### A. Sufficiency of the evidence

■ Penn argues that there was insufficient evidence to support the jury's verdict in favor of Medcalf on his claim that Penn

discriminated against him on the basis of gender in hiring a Head Coach for the women's crew program. We disagree.

### 1. The legal framework of reverse discrimination cases

42 U.S.C. § 2000e–2, which governs employer hiring practices under Title VII, states that

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2.

Reverse discrimination cases in this Circuit are governed by *Iadimarco v. Runyon,* 190 F.3d 151 (3d Cir.1999). In *Iadimarco,* we developed a modified burden shifting analysis in which a plaintiff must first establish a prima facie case of reverse discrimination, after which the defendant then must articulate a legitimate, nondiscriminatory reason for the hiring decision. Once the defendant does this, the plaintiff has the opportunity to prove by a preponderance of the evidence that the defendant's articulated reason is merely pretextual, and that the true reason for the failure to hire plaintiff was discrimination. *Id.* at 166.

In order to make out a prima facie case of discrimination, Medcalf needed "to present sufficient evidence to allow a fact finder to conclude that [Penn] is treating some people less favorably than others based upon a trait that is protected under Title VII." *Id.* at 161. Penn conceded that Medcalf made out his prima facie case by showing: (1) that he was a male; (2) who applied for and was qualified to perform the job of Women's Crew Coach at Penn;

(3) that he was rejected; and (4) that Penn selected a woman for the position.

Once Medcalf established his prima facie case, the burden shifted to Penn "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Iadimarco,* 190 F.3d at 157 (quoting *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). This burden "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotations omitted). Penn's proffered legitimate, non-discriminatory reasons for hiring Kirch over Medcalf were that she was more qualified with respect to (1) knowledge of NCAA and Ivy League rules, (2) recruiting, (3) fundraising, (4) administering budgets, and (5) knowledge of Ivy League student financial aid requirements and constraints.

Once Penn proffered a legitimate reason for its hiring decision, Medcalf then had the burden of persuasion to show that Penn's stated reason for rejecting Medcalf "was in fact pretext." *McDonnell Douglas,* 411 U.S. at 804.

A plaintiff can show pretext sufficient to defeat a motion for summary judgment or judgment as a matter of law by "point[ing] to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Iadimarco,* 190 F.3d at 166 (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)). We elaborated in *Fuentes* that plaintiff's evidence rebutting the employer's proffered legitimate reasons "must allow a factfinder reasonably to in-

fer that each of the employer's proffered nondiscriminatory reasons ... was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* Plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Id.* at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 527 (3d Cir.1992)). Where the plaintiff offers evidence "that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail." *Iadimarco,* 190 F.3d at 166.[1] We note that "an employer cannot successfully defend a hiring decision against a Title VII challenge merely by asserting that the responsible hiring official selected the man or woman who was 'the right person for the job.'" *Iadimarco,* 190 F.3d at 166.

2. Evidence supporting the rejection of Penn's proffered reason for hiring Kirch over Medcalf and interviewing other candidates over Medcalf

Viewing the evidence in the light most favorable to Medcalf, and drawing reasonable inferences in his favor, the jury rationally could have concluded, based on inconsistencies, contradictions, and implausibilities in Penn's proffered legitimate reasons for not interviewing and/or hiring Medcalf, that such reasons were unworthy of credence.

The evidence, viewed favorably to Medcalf, reveals inconsistencies in Penn's position as to what "hiring criteria" it used to make the decision regarding the open coaching position, and what qualities it valued most highly in candidates. The initial indication of Penn's hiring criteria can be found in the Position Announcements, which Femovich placed in numerous national rowing publications to attract candidates. The Position Announcement summarized the coach's role as follows: "manages, directs, and coaches the Women's Crew. Responsible for the recruiting, training, and counseling of student-athletes. Communicates with the Director of Rowing to coordinate the maintenance and use of facilities and equipment. Receives general supervision, and reports to the Head Coach of Men's and Women's Rowing." App. at 1716. The next section of the document, entitled "ACTUAL DUTIES," described the first actual duty of the coach as: "Directs and coaches Women's Crew, instructs team members in rowing techniques, trains novices and advanced rowers in rowing tanks and on the water. Makes Boat Selection for both Varsity and Junior Varsity." App. at 1716–1717.

The Position Announcement placed a high importance on actual coaching ability—i.e., providing technical coaching expertise to the athletes and selecting racing lineups for competition—as evidenced by the fact that these are the first two "actual

---

**1.** Although *Iadimarco* speaks in terms of motions for summary judgment, the Supreme Court has stated that

the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same."... It therefore follows that, in entertaining a motion for

judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.

*Reeves,* 530 U.S. at 150.

duties" of the coach described in the announcement. Femovich herself drafted this Announcement and testified that it provided an overview of the major responsibilities of the coaching position. Thus, a jury could properly have found that, given the prominent placement Penn gave to actual on-the-water coaching skills in its Position Announcement, that was something it initially valued highly in a coach.

Yet at trial, Penn focused almost exclusively on the administrative side of coaching, contending that it selected Kirch over Medcalf based upon her relative superiority in areas such as: (1) knowledge of NCAA and Ivy League rules, (2) recruiting, (3) fundraising, (4) administering budgets, and (5) knowledge of Ivy League student financial aid requirements and constraints. The jury may have regarded this emphasis on administrative capabilities as suspect in light of the fact that there was strong evidence that Medcalf was a superior technical coach to Kirch and the other women who were granted interviews. Penn conceded that the evidence viewed in the light most favorable to Medcalf "supports the argument that he was a better on-the-water coach," but asserted that this was not important when compared with the other hiring criteria it evaluated.

Indeed, almost all of the testimony the jury heard regarding Barbara Kirch's superiority as a candidate related to her superiority in administrative areas. For example, when asked why he was impressed with Kirch, Athletic Director Bilsky said: "she had been a head coach for nine years at a peer university.... Recruiting is similar.... Managing a budget, sensitivity to fundraising, having staff work for her." App. at 3276–77. Notably, Bilsky did not mention actual coaching ability, but focused on the administrative aspects of the job. Similarly, Penn's counsel, in its opening statement, told the jury that "[y]ou'll learn that knowledge of Ivy League Schools, Ivy League rules, NCAA rules are all an important aspect of the job because the Ivy League is an unusual league, doesn't offer scholarships, has unusual rules about recruiting and things like that." App. at 2484.

Penn's sudden de-emphasis of the value of actual coaching skills is at the least a "weakness" which tends to indicate that Penn's proffered reasons were not credible. Given the emphasis on actual coaching ability in the Position Announcement, the jury could easily have concluded that Penn later altered its coaching priorities to make possible the hiring of Kirch.

Another inconsistency in the hiring criteria which the jury could have considered is illustrated by Penn's assertion that "intimate knowledge" of NCAA and Ivy League rules was vital to the position of Women's Crew Coach, and that this was an important area where Barbara Kirch was superior to Medcalf. Yet "knowledge of NCAA and Ivy League rules" was not mentioned in the Position Announcement as a major responsibility or duty of the coach. During direct examination, Femovich stated that compliance with Ivy League and NCAA rules is important because "it's part of the laws of intercollegiate athletics." App. at 3163. But on cross examination, she acknowledged that, although the Position Announcement is intended to be "a general overview of the major responsibilities" of the coaching position, knowledge of NCAA rules and/or Ivy League rules did not appear as a criterion on the Position Announcement. App. at 3190–91. Bilsky himself conceded that there was "[n]othing in either of these position announcements, with all the information, and all the actual knowledge needed and actual duties, nothing in here about having knowledge of the NCAA or Ivy

League rules." App. at 3301. Given that knowledge of NCAA and Ivy League rules was not even mentioned in the Position Announcement, Penn's claim at trial that it was one of the primary bases on which they selected Kirch over Medcalf rings hollow. Viewing the evidence in the light most favorable to Medcalf, Penn's shifting hiring criteria cast doubt on the credibility of Penn's professed reasons for not granting Medcalf an interview.

In addition to the inconsistencies in Penn's proffered hiring criteria over time, Medcalf provided additional evidence of pretext by showing that, applying the largely administrative hiring criteria Penn focused on at trial, Medcalf was far more qualified for the position than the other women, besides Kirch, who at least received interviews. Medcalf's six years of coaching experience at Penn, combined with his experience at Vesper Boat Club and other universities, imbued him with significantly more experience than the women to whom Penn granted interviews in terms of knowledge of NCAA and Ivy League rules, Ivy League financial aid and recruiting, and fundraising. Medcalf had significantly more total coaching experience, including as a head coach, than all of the female interviewees aside from Kirch. From this evidence, the jury rationally could have concluded that Penn had placed gender above all of its other stated criteria, and impermissibly treated those other three applicants more favorably than Medcalf. *See Fuentes,* 32 F.3d at 765 (noting that to survive summary judgment, plaintiff could show "that the employer treated other, similarly situated persons not of his protected class more favorably"). Because Femovich had responsibility for narrowing the field of applicants and selecting the final candidates for Bilsky to interview, if she narrowed the pool based on gender and excluded male applicants from those being interviewed, the process she employed effectively treated female applicants more favorably and foreclosed a male applicant from getting the job. In conclusion, the jury rationally could have concluded that Medcalf was more qualified than the other candidates who received interviews, and that Penn's failure to grant him an interview was based upon his gender.

### 3. Evidence of discriminatory animus

Sufficient evidence also exists for a rational jury to have concluded that Penn's decision regarding who to consider for the position of coach was motivated by discriminatory animus. As a preliminary matter, we must dispose of Penn's argument that Steve Bilsky was the sole actual decisionmaker, such that any statements by Femovich cannot be used to attribute discriminatory animus to Penn. Penn argues in its brief that "as a matter of law, the statements that plaintiff's witnesses attributed to Ms. Femovich, who did not make the hiring decision, are simply not sufficient to prove that Mr. Bilsky acted with a discriminatory animus in making the decision to hire Ms. Kirch." In support of this position, Penn cites *Ezold v. Wolf, Block, Schorr and Solis–Cohen* for the proposition that "comments that nondecisionmakers make that purportedly evidence a discriminatory intent [are] insufficient to establish that an employer's motivation was discriminatory." 983 F.2d at 544–547. *Ezold* and other cases stating that mere "stray remarks" by non-decisionmakers should not be considered in determining whether discriminatory animus existed are easily distinguishable from the instant case. *See Ezold,* 983 F.2d at 546–47 (six comments made over the five years before decision at issue by an individual not working for the employer at the time of decision was too remote to show independently that unlawful discrimination

was more likely than proffered reason for failure to promote); *Fuentes*, 32 F.3d at 767 (mispronunciation of plaintiff's name 20 months prior to employment decision and statement by supervisor that he would rather call plaintiff "Louis" than "Luis," because he had difficulty pronouncing Luis, is not sufficient to establish that employer discriminated against plaintiff based on national origin); *Gomez v. Allegheny Health Services, Inc.*, 71 F.3d 1079, 1085 (3d Cir.1995) (person making the remark had no supervisory authority over plaintiff and was "outside the chain of decision-makers who had the authority to hire and fire plaintiff.").

The record contains substantial evidence that Femovich was intimately involved in the process of selecting candidates to interview for the position of Women's Crew Coach, such that the jury could properly infer that she was a decisionmaker. Bilsky testified that he gave her the authority to conduct the search process for a head coach "as she saw fit." In addition to drafting the advertisements for the open position, which included an overview of the major responsibilities of the position, Femovich testified that she was responsible for checking references, reviewing resumes, selecting who would be interviewed, and setting up interview schedules. She also participated in interviewing each final candidate and giving recommendations to Bilsky.[2] Stan Bergman testified that there were instances where Femovich wanted to

interview particular people and he conceded. In addition, the remarks that she made regarding her desire to put a woman in the position were clearly related to the search process for the specific position Medcalf applied for, such that they may properly be considered as evidence of discriminatory animus by Penn. *See Antol v. Perry*, 82 F.3d 1291, 1301 (3d Cir.1996) (noting that "evidence that an individual involved in the selection process" called plaintiff a "spasm head" on multiple occasions "supports an inference of discrimination"). *See also Waldron v. SL Indus., Inc.*, 56 F.3d 491, 502 (3d Cir.1995) (crediting "evidence of age-related animus or bias in the form of a comment made to" the plaintiff by a person involved in the decision to terminate him).

The jury also could have credited testimony by student-athletes that Femovich made comments indicating that her decision regarding who to interview and hire may have been based, at least in part, on her desire to hire a female for the position.

Stan Bergman testified at trial that the facts stated in Medcalf's EEOC complaint against Penn were accurate. One of the assertions Medcalf made in the complaint was that Bergman had told him that, at a meeting among Bergman, Bilsky, and Femovich regarding the coaching position, Femovich and Bilsky advised Bergman that they could not hire a male for the open position because all of the other row-

---

**2.** At oral argument, Penn's counsel asserted that Medcalf had somehow inappropriately "circumvented the hiring process" by submitting his resume directly to Bilsky, whereupon Bilsky, as the asserted "sole decisionmaker," determined that Medcalf was not qualified for the coaching position. In actuality, as Femovich herself conceded on cross examination, Medcalf, like Barbara Kirch and twenty-some other applicants, submitted his resume to Stan Bergman in response to the first Position Announcement posted by Penn. Both Stan

Bergman and Carolyn Femovich had the opportunity to review Medcalf's resume. Only when Medcalf failed to receive a response to his repeated attempts to schedule an appointment with Femovich did he forward his resume to Bilsky. Interestingly, in its discussion of circumvention of the hiring process, Penn failed to mention that certain of the women who did receive interviews were scheduled for such interviews without ever having submitted a resume to Penn.

ing coaches then on staff were male. Medcalf himself also testified that Femovich had indicated to him that, although he was presumably disappointed in Penn for not selecting him for the position, she would find a woman as least as qualified as he was.

Based on this evidence, a reasonable fact finder could have concluded that discriminatory animus more likely than not was a motivating factor in Penn's decision not to interview Medcalf and consider him for the position.

### B. Punitive damages

■ Penn argues on appeal that Medcalf failed to present evidence sufficient to allow a rational jury to conclude that Penn met the legal standard for the imposition of punitive damages. In *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court held that punitive damages may be recovered in claims under Title VII for cases involving intentional discrimination " 'where the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices *with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'* " *Id.* at 534 (quoting 42 U.S.C. § 1981a(b)(1)) (emphasis in original).

The District Court instructed the jury as follows:

In addition to actual damages, the law permits a jury to award punitive damages to the injured party. And punitive damages are awarded to the plaintiff to punish the defendant for conduct which is especially outrageous, and to deter a person from engaging in such conduct in the future.

Punitive damages may not be awarded unless the defendant's conduct was outrageous. Outrageous conduct is defined as conduct which is performed with a bad motive, malice, or with reckless indifference to the interests of others.

Reckless indifference occurs when someone knows or has reason to know of the facts which create a high degree of risk of harm to another, and deliberately proceeds to act or fails to act, in conscious disregard of or indifference to that risk.

If you decide to award punitive damages, you should fix the amount of damages with calm discretion, sound reason. And punitive damages also should never be awarded or fixed in an amount because of any sympathy, bias, or prejudice with respect to any party in the case.

An employer can be liable for punitive damages for its employee's actions if: (1) its agent is employed in a position of managerial capacity; (2) the agent acts within the scope of employment; and (3) the agent acts with malice or reckless indifference towards the federally protected rights of the plaintiff. *Kolstad,* 527 U.S. at 535–45. However, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* at 545 (internal quotations omitted).

A rational jury also could have found that Carolyn Femovich, who was clearly acting in a managerial capacity in the scope of her employment, acted with the requisite malice or reckless indifference to the federally protected rights of Medcalf. Femovich knew that Penn had an equal opportunity employment policy that prevented Penn from taking gender into account in hiring, yet she did not grant any male candidate an interview, and several

witnesses testified that she intended to put a woman in the coaching position.

 On appeal, Penn argues that under *Kolstad,* Penn cannot be liable for any intentional discrimination by Femovich simply because she was acting, with malice, in a managerial capacity within the scope of her employment, provided that Penn was making good faith efforts to comply with Title VII. The District Court did not give the jury a *Kolstad* charge, nor does Penn object to the jury instructions on appeal.[3] Because the jury charge did not instruct on good faith, by failing to object to the charge on that ground, Penn has waived any argument that its good faith efforts to comply with Title VII preclude the imposition of vicarious liability for Carolyn Femovich's actions.

Based on the charge the jury was given, the evidence is sufficient to support the award of punitive damages. Carolyn Femovich was aware that Penn had an antidiscrimination policy that prohibited Penn from taking gender into account when hiring. Yet she granted neither Andrew Medcalf nor any other male candidate an interview, despite the fact that Medcalf was substantially more qualified than the females, aside from Kirch, who received interviews. Femovich made statements to multiple individuals that she sought to hire a woman for the position. Thus, a rational jury could have found that Femovich acted with reckless disregard for Andrew Medcalf's rights under Title VII.

## V. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.

---

**3.** The Application of Kolstad presents some interesting questions of first impression in our Circuit. For example, in addition to the question of what constitutes "good faith compliance" under Kolstad, the Third Circuit has not addressed the issue of whether the good faith compliance standard set out in *Kolstad* is an affirmative defense for which the defendant bears the burden of proof, or whether the plaintiff must disprove the defendant's good faith compliance with Title VII by a preponderance of the evidence. A number of other circuits have determined that the defense is an affirmative one. *See, e.g., Romano v. U–Haul Int'l,* 233 F.3d 655, 670 (1st Cir. 2000) *cert. denied,* 534 U.S. 815, 122 S.Ct. 41, 151 L.Ed.2d 14 (2001); *Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376, 385 (2d Cir.2001); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir.2000); *Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 188 F.3d 278, 286 (5th Cir.1999). Nevertheless, we need not resolve these issues here, since the jury was not given a *Kolstad* charge, and the defendants did not object to the language of the charge with respect to punitive damages.