**Rebecca HARDEN, Appellant**

v.

**Donald James ROSIE, as an individual, and the Albert Gallatin School District.**

**R.H.**

v.

**Donald James Rosie, as an individual, and the Albert Gallatin School District.**

**Appeal of: Albert Gallatin School District.**

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 2013.

Decided Sept. 11, 2014.

---

Anthony G. Sanchez, Pittsburgh, for designated appellant Albert Gallatin School District.

Thomas W. Shaffer, Uniontown, for appellee.

BEFORE: BONNIE BRIGANCE LEADBETTER, Judge, and P. KEVIN BROBSON, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge LEADBETTER.

Before the court are the cross-appeals of Rebecca Harden and Albert Gallatin School District from orders of the Court of Common Pleas of Fayette County disposing of post-trial motions following a jury verdict in favor of Harden and against the School District. Harden's action was based on a teacher-student sexual harassment claim under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (Title IX).[1] Common pleas granted the new trial after concluding that it had erroneously admitted irrelevant evidence that may have been highly prejudicial to the School District, thereby depriving it of a fair trial. The trial court also denied the School District's motion for judgment notwithstanding the verdict (jnov), concluding that the issues raised therein, including whether Harden had met her burden of demonstrating that the School District had sufficient notice or knowledge of the harassment and failed to respond appropriately, were simply issues of fact for the jury rather than questions of law for the court.[2] After review of the arguments and record, we conclude that common pleas erred in denying the motion for jnov.[3]

For all intents and purposes, it is undisputed that in 2006, Harden was a sixteen

---

1. The jury returned a verdict in the amount of $300,000; $100,000 against the School District for violating Title IX and $200,000 against Donald James Rosie, the subject teacher, for battery and a violation of 42 U.S.C. § 1983 (pertaining to the deprivation of a constitutional right under color of state law). Rosie is not a party on appeal.

2. Although the court's order granting a new trial is immediately appealable pursuant to Rule of Appellate Procedure 311(a)(6), the court certified the interlocutory order for purposes of immediate appeal, concluding that the matter involved controlling questions of law of which there are substantial grounds for differences of opinion, such that an immediate appeal would materially advance the ultimate termination of the matter. *See* 42 Pa. C.S. § 702(b).

3. In reviewing whether a party was entitled to jnov, we consider the evidence, together with all favorable inferences which can be drawn therefrom, in the light most favorable to the verdict winner. *Beil v. Telesis Constr., Inc.,*

608 Pa. 273, 11 A.3d 456, 462 (2011). As our Supreme Court has stated, there are two bases for the grant of jnov:

> [O]ne, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor....

*Phillips v. A–Best Prods. Co.,* 542 Pa. 124, 665 A.2d 1167, 1170 (1995) (internal citation and quotations omitted). Regarding the latter ground for the entry of jnov, "the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure." *Reott v. Asia Trend, Inc.,* 7 A.3d 830, 835 (Pa.Super.2010) (internal citation and quotation omitted).

year old high school student in the School District, and Donald Rosie, although on sabbatical at the time, was a sixth grade teacher at the School District's middle school.[4] Rosie also coached the girls' high school softball team until his resignation from the position in April 2005. Rosie taught Harden in sixth grade during the 2001–02 school year and the two remained in contact after Harden completed sixth grade. Between March and June of 2006, while Rosie was on sabbatical, Rosie and Harden were involved in a consensual sexual relationship, which they both kept private from others. In June 2006, the Pennsylvania State Police contacted the School District's Superintendent, Walter Vicinelly, and informed him that a parent and student made a complaint, indicating that the student was involved in a sexual relationship with one of the District's teachers; the Police did not identify the student or teacher. Shortly thereafter, Harden's mother contacted Vicinelly and informed him that her daughter, Rebecca, was sexually involved with Rosie. After meeting with Harden's mother, Vicinelly filed a report with Children and Youth Services regarding Rosie and contacted the local district attorney. Rosie was suspended without pay in August and formally terminated by the School Board in February 2007.

In October 2006, Harden, through her mother, commenced the underlying civil action against Rosie and the School District, proceeding to trial against the District on the theory that its actions violated Title IX, causing Harden harm and entitling her to monetary damages. As noted, although the jury found in favor of Harden against both defendants, common pleas granted the District's motion for a new trial. Before addressing the issues and arguments raised on appeal to this court, it is helpful to set forth the relevant statutory scheme and the elements of a Title IX claim.

■ Title IX provides in pertinent part that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" Section 1681(a), 20 U.S.C. § 1681(a). Title IX is designed to prevent recipients of federal funds from using such funds in a discriminatory manner. It is now well settled that this statutory prohibition against discrimination based upon gender encompasses a teacher's sexual harassment or abuse of a student and provides the student with a private cause of action for damages against the school district.[5] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). *See also Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 359 (3d Cir.2005); *Warren v. Reading Sch. Dist.*, 278 F.3d 163, 168–9 (3d Cir. 2002). However, Title IX cannot be invoked by a student to impose liability on a particular teacher or school official. *Douglas v. Brookville Area Sch. Dist.*, 836 F.Supp.2d 329, 343 (W.D.Pa.2011) [citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009) ].

■ In discussing the private cause of action under Title IX, the United States

---

4. Rosie began teaching in 1972 in one of the District's elementary schools. He apparently joined the middle school when sixth grade was moved to the middle school. It is not clear whether the two schools are on the same campus.

5. The private right of action is judicially implied rather than express. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283–84, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).

Court of Appeals for the Third Circuit has distinguished the cause of action under Title IX from that provided under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (pertaining to discrimination and harassment in the workplace), noting that the two acts serve different purposes. *Warren*, 278 F.3d at 170. "The explicit cause of action in Title VII is intended to *punish* acts of discrimination, whereas the cause of action in Title IX is intended as protection for the student." *Id.* (citing *Gebser*, emphasis in original). Focusing on the concern that school districts should first be afforded the opportunity to remedy a discriminatory situation before facing penal measures, the Third Circuit observed in *Warren:*

> [T]he Court in [*Gebser*] was therefore concerned that an implied right of private action not interfere with the opportunities for voluntary compliance built into the statutory scheme of Title IX, and administrative remedies that Congress included in the statutory scheme. Holding a school district responsible for actions of a principal [or other responsible school official] fixes responsibility at [a] sufficiently high level to afford the recipient of Title IX funds an opportunity to respond to claims of discrimination before funds are jeopardized by a teacher's conduct. It also affords an opportunity for voluntary compliance with the

contractual undertakings that are part of Title IX funding.

*Id.* at 170–01.[6] It also bears emphasizing that the United States Supreme Court in Gebser expressly held that a private cause of action against a school district under Title IX cannot be premised on principles of respondeat superior or constructive notice; rather, actual notice of discrimination must be demonstrated in order to prevail on a claim under Title IX. *Gebser*, 524 U.S. at 285, 118 S.Ct. 1989. Consequently, following Gebser and its progeny, a school district may be held liable for a teacher's sexual harassment or abuse of a student only if: "(1) the school district received federal financial assistance, (2) the student was subjected to discrimination on the basis of sex, and (3) an 'appropriate person'[7] (4) had actual notice of, and was deliberately indifferent to, the discrimination." *Chancellor v. Pottsgrove School Dist.*, 501 F.Supp.2d 695, 704 (E.D.Pa.2007) (footnote added). *See also Bostic*, 418 F.3d at 360.

Regarding the specificity of knowledge required to impose liability on a school district, the federal courts have held that mere knowledge of the possibility of harassment or potential for abuse is insufficient to impose liability under Title IX. *See Bostic*, 418 F.3d at 360–61; *Baynard v. Malone*, 268 F.3d 228, 237–38 (4th Cir. 2001) [discussing standard of actual notice required by *Gebser* and *Davis v. Monroe County Board of Education*, 526 U.S. 629,

**6.** The Court in *Warren* also observed that Title IX is expressly remedial in nature. 278 F.3d at 169 (discussing *Gebser* ).

**7.** An "appropriate person" is an individual that has authority to end the discriminatory conduct. *Warren v. Reading Sch. Dist.*, 278 F.3d 163, 169–70 (3d Cir.2002). In most cases, a school principal constitutes an appropriate person for purposes of actual notice. *Id.* at 170. On the other hand, while other teachers and guidance counselors may have a duty to report suspected abuse under state

law, they generally do not constitute appropriate persons for purposes of actual notice under Title IX because they lack the authority to take corrective measures. *Id.* at 173. *See also Douglas v. Brookville Area Sch. Dist.*, 836 F.Supp.2d 329, 346–47 (W.D.Pa.2011); *Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1256 (11th Cir.2010) (noting issue of who is an appropriate person is "necessarily a fact-based inquiry because officials' roles vary among school districts") (internal citation and quotation omitted).

119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) ]. Rather, Title IX is violated when the district is "deliberately indifferent to *known acts* of teacher-student discrimination." *Bostic*, 418 F.3d at 361 [quoting *Davis*, 526 U.S. at 643, 119 S.Ct. 1661 (emphasis in original) ].[8] Moreover, if the notice of the discriminatory conduct does not involve the plaintiff, the notice provided to the school district must either involve known acts of sufficiently similar conduct to that alleged by the plaintiff or known actions that are relatively recent and sufficiently concerning that school officials are alerted to a substantial risk of danger to students.[9]

Significantly, after construing Title IX to require school officials to possess actual notice of known acts of discrimination, the Supreme Court held in *Gebser* that complaints by parents to a high school principal regarding a teacher's improper sexually suggestive comments to students in the classroom were insufficient to demonstrate that school officials had the requisite notice that the teacher was possibly involved in a sexual relationship with a student. 524 U.S. at 291, 118 S.Ct. 1989.

Similarly, in *Escue v. Northern Oklahoma College*, 450 F.3d 1146 (10th Cir. 2006), the Tenth Circuit held that prior allegations of misconduct against the defendant university professor failed to establish actual notice for purposes of the student-plaintiff's Title IX claim against the university. There, the plaintiff averred in her complaint that in 2002, the professor touched her inappropriately and made inappropriate sexual remarks about her and to her. The evidence pertaining to prior notice involved reports that the professor had dated two older, non-traditional students (one was his student and the other was not) in the past (one of the relationships purportedly occurred in the early 1990s), in addition to two harassment complaints, which were made against the professor nine years earlier. One of the complaints alleged that the professor had

---

8. The Fourth Circuit has interpreted the notice requirement of *Gebser* to require "actual knowledge of the discriminatory conduct in question." *Baynard*, 268 F.3d at 238. In *Bostic*, however, in affirming the denial of a new trial, the Third Circuit approved the district court's jury instruction on notice, that: "An educational institution has 'actual notice,' sometimes called 'actual knowledge' of discrimination, if an appropriate person at the institution has knowledge of facts sufficiently indicating substantial danger to a student so that the institution can reasonably be said to be aware of the danger." 418 F.3d at 360. *Accord Chancellor*, 501 F.Supp.2d at 708 (quoting *Bostic* jury instructions and stating: "Plaintiff must show that [the principal] 'had knowledge of facts sufficiently indicating substantial danger to a student so that [the school district] can reasonably be said to be aware of the danger.' ... 'Actual notice' cannot be based on a mere 'possibility.' "). *See also* 3C Fed. Jury Prac. & Instr. § 177.36 (5th ed. 2001) (stating: "An education institution has 'actual knowledge' if it knows the underlying facts, indicating sufficiently sub- stantial danger to students, and was therefore aware of the danger.").

9. In construing the statutory scheme and defining the scope of a school district's liability premised on notice and knowledge, the Supreme Court theorized in *Gebser:*

   Presumably, a central purpose of requiring notice of the violation "to the appropriate person" and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures.... When a teacher's sexual harassment is imputed to a school district or when a school district is deemed to have "constructively" known of a teacher's harassment, by assumption the district had no actual knowledge of the teacher's conduct. Nor, of course, did the district have an opportunity to take action to end the harassment or to limit further harassment. 524 U.S. at 289, 118 S.Ct. 1989.

called a student "butch" on multiple occasions and the other alleged that the professor had slapped a student on the rear-end while she was boarding a bus. The court held that the professor's two relationships with students close to his age (presumably consensual in the absence of evidence to the contrary) did not serve to put the university on notice that its students were at risk of sexual harassment and that the two harassment complaints were too dissimilar to the plaintiff's claims to alert the university to a substantial risk of abuse. *See also Baynard v. Malone,* 268 F.3d 228 (holding, *inter alia,* that report of former student and his mother that he was sexually abused by defendant-teacher 15 years earlier was insufficient to provide actual notice that teacher currently abusing one of his students).

On the other hand, in *Warren,* the Third Circuit held that evidence demonstrating that two or three years before the student-plaintiff was sexually abused by a teacher, a complaint made to the school principal by a concerned parent that the same teacher was taking his son to the teacher's house and paying him to "[lift the teacher] up and down," was sufficient to demonstrate that the school district had actual notice of the teacher's discriminatory conduct. 278 F.3d at 173.

Similarly, in *Doe v. School Board of Broward County,* 604 F.3d 1248 (11th Cir. 2010), the Eleventh Circuit held that evidence of recent complaints to the principal (within nine months of the violent sexual assault on the plaintiff) by two students, who reported that the subject teacher propositioned them, lifted their shirts to see their stomachs or asked them to show him their stomachs, attempted to blackmail one of the students into having sex and made sexually-suggestive comments about the girls' bodies, were sufficient to satisfy the plaintiff's burden regarding ac-

tual notice for summary judgment purposes.

■ In addition, a plaintiff must show that the school reacted to the established notice with deliberate indifference. The Supreme Court characterized "deliberate indifference" in *Gebser* as "an official decision by the recipient not to remedy the violation." 524 U.S. at 290, 118 S.Ct. 1989. *See also Chancellor,* 501 F.Supp.2d at 708 (characterizing deliberate indifference as a clearly unreasonable response, and stating that if a school official took timely and reasonable measures to end the harassment, such response would not constitute deliberate indifference even if the efforts were unsuccessful) (internal citations and quotations omitted). Moreover, while deliberate indifference is certainly a factually driven issue, when the facts are largely undisputed, it can be determined as a matter of law. *See Davis,* 526 U.S. at 649, 119 S.Ct. 1661 (stating: "[Deliberate indifference] is not a mere reasonableness standard.... In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not clearly unreasonable as a matter of law.") (internal quotations omitted).

As the Supreme Court stated:

No one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher, and that the teacher's conduct is reprehensible and undermines the basic purposes of the educational system. The issue in [a case under Title IX], however, is whether the independent misconduct of a teacher is attributable to the school district that employs him under a specific federal statute designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner.... Until

Congress speaks directly on the subject, however, we will not hold a school district liable in damages under Title IX for a teacher's sexual harassment of a student absent actual notice and deliberate indifference.

*Gebser*, 524 U.S. at 292–93, 118 S.Ct. 1989.

Turning to the present case, we emphasize that the issue before us is not whether Rosie sexually harassed students, nor whether he is responsible for the consequences of serious acts of moral turpitude. Rather, the dispositive issue on appeal is whether, as a matter of law, the evidence adduced at trial was sufficient to demonstrate (1) that the District had actual notice that Rosie was sexually harassing Harden (or, alternatively, whether, based upon the known facts, the District had actual notice that Rosie posed a substantial danger to students), *and* (2) that the District was deliberately indifferent to known acts of discrimination.[10] As to notice, the School District argues that Harden did not demonstrate at trial that an appropriate person had actual notice that Rosie and Harden (or Rosie and any other student) were engaged in a sexual relationship. The District argues that the evidence concerning reports of other harassing conduct by Rosie involved incidents and actions too remote in time or too dissimilar to establish notice that Rosie posed a risk of engaging a student in a sexual relationship.

Finally, the School District argues the evidence failed to demonstrate that it reacted with deliberate indifference to the allegations of harassment. We agree.

■ We begin by noting that no evidence was offered that the School District possessed actual notice that Rosie was involved in a sexual relationship with Harden or any other student before the State Police contacted Superintendent Vicinelly.[11] There was, however, evidence that certain school employees were told at various times about inappropriate behavior by Rosie, and we will discuss each of them seriatim.[12]

One such incident involved another teacher, George James Hamilla, III, who saw Harden at Rosie's home. Hamilla stated that he drove to Rosie's house one day when Rosie was on sabbatical to see if he wanted to join him for lunch. He observed a girl (whom Harden later identified as herself) standing in Rosie's open garage while Rosie washed her car. There was no suggestion of any activity of a sexual nature. Moreover, this incident could not constitute actual notice of the relationship to the District because there was no trial evidence that Hamilla had authority to take corrective measures to end the discrimination, nor that he reported what he saw to anyone else. *See War-*

10. In light of our conclusions regarding these elements of the claim, we need not address the remaining arguments raised on appeal.

11. Here, we specifically reject Harden's assertions that the District had actual notice of her relationship with Rosie because he began to "sexually engage [her] when she was 10 years of age." Supplemental Brief of Designated Appellee, Rebecca Harden at 19. In her brief, Harden does not point to any evidence which would demonstrate that the District was aware of Rosie's actions toward her when she was younger, and our review of the trial record fails to reveal any evidence to

support that claim. Essentially, Harden contends that the District had constructive notice of the harassment; that theory, however, has been rejected as a basis for liability under Title IX.

12. There was additional testimony concerning inappropriate conduct by Rosie which was never disclosed to school personnel. Because these events were relevant to the case against Rosie, but are irrelevant to the issues of the District's knowledge and its reaction thereto, we will not discuss them here.

*ren,* 278 F.3d at 173; *Douglas,* 836 F.Supp.2d at 346.

We draw a similar conclusion regarding the testimony of Norma Griffith, the mother of seventeen year-old Anna Griffith, who was taught by Rosie in sixth grade. Mrs. Griffith testified regarding Rosie's inappropriate physical contact with her daughter (touching her hair, putting his chin on her head, etc.) and that she told Anna's special education teacher or case-worker about Rosie's behavior, noting to her that she wanted to keep the matter confidential. Such evidence cannot constitute actual notice to the District because there was no evidence that the teacher/case-manager had the requisite authority to address the alleged harassment.

Former student Lisa Keffer, who was born in 1984, testified to an incident involving Rosie that occurred when she was in sixth grade.[13] According to Lisa, on that day she was in the process of clearing her lunch tray and exiting the school cafeteria, when Rosie, who was monitoring the lunch period, yelled at her and told her to pick-up trash from the floor, which he apparently thought she had dropped. Lisa testified that when she bent down to pick up the trash, Rosie reached under her shirt and grabbed her breast. Lisa told the school custodian who was standing nearby and she believes he went to get the principal, who happened to be Mr. Vicinelly. She reported what happened to the principal while they were in the cafeteria and she repeated her story when he took her to his office. The principal called her mother to come to the school and told her he would take care of it. According to Lisa, there were other girls with her at the time. While she did not indicate that they specifically saw anything, she stated that the principal did not interview them [14] and she did not recall speaking to any school personnel about the incident thereafter. Lisa completed sixth grade at a different school and she had no further contact with Rosie when she returned to the District for middle school.

Lisa's mother, Betty Rafail Sanders, testified that after she spoke to the principal about what had happened, he called her approximately one week later to indicate that he had investigated the incident and couldn't confirm whether it had happened or not. According to Mrs. Sanders, she trusted the principal and did not think that he would lie. Superintendent Vicinelly testified that the above-described incident occurred during Spring of the 1996–97 school year. Vicinelly, who was the principal at the time, echoed Lisa's description of events to the extent that Rosie was on duty and a commotion occurred while Lisa was emptying her tray and preparing to leave the cafeteria. When he arrived at the scene, Lisa was crying and reported to him that Rosie had touched her breast. He also noted that Rosie appeared to be upset and reported to him that Lisa would not do as he instructed. After talking to Lisa, Vicinelly interviewed Rosie, who stated that he directed Lisa to pick up a piece of trash from the floor and she refused to do so. He indicated that he only reached for her tray or arm and if there was any contact with her breast, it was unintentional or accidental. Vicinelly also spoke to the custodian, who confirmed that Lisa and Rosie had an argument and that Rosie

---

**13.** Keffer was not available at the time of trial so her deposition, taken in 2008, was read to the jury. Assuming that Keffer was 12 years of age in sixth grade, she attended sixth grade in 1996, ten years before Rosie's sexual involvement with Harden.

**14.** She did note that none of the girls ever came forward to indicate that they saw Rosie grab her breast.

asked Lisa to do something and that she didn't comply. When Vicinelly asked him if he observed Rosie touch Lisa, the custodian stated that he only observed him take Lisa's arm, he did not observe him touch her breast or "anything like that." Notes of Testimony (N.T.) at 1309 (February 21, 2012). Vicinelly also talked to several women working in the cafeteria, but they did not observe anything. According to Vicinelly, he made notes of his conversations with everyone and created a file.[15] Vicinelly denied knowledge of any other reports that Rosie inappropriately touched a student. Vicinelly noted that he called Lisa's mother later that day or the next morning to explain everything.

Assuming that Rosie did indeed grab Lisa's breast as described, the incident, which occurred nearly 10 years before the harassment at issue, is simply too remote to constitute actual notice to the District that Rosie would engage in a sexual relationship with a student in 2006 or that Rosie posed a substantial risk of danger to the students, particularly given the inconclusive results of Vicinelly's investigation. In addition, Vicinelly was not deliberately indifferent to the allegation: he investigated the matter quickly, Rosie denied any intentional touching, and the custodian's observations confirmed Rosie's version of events. Moreover, Vicinelly documented his investigation and created a file to permanently document the incident.

Similarly, the testimony of former student Tami Patterson was not sufficient to provide actual notice to the School District relative to Harden's Title IX claim. According to Tami, she was Rosie's student in approximately 1972–74, and she told Assistant Superintendent Mario Tiberi at a restaurant in 2005 that when she was a student in the seventies, Rosie touched her face and hair and commented on her rear-end. Tami admitted on cross-examination that she testified during an earlier deposition that she had this conversation closer to when Rosie was caught with Harden. She also equivocated on cross-examination regarding the amount of detail she actually gave the Assistant Superintendent when she spoke to him.[16] Again, this report of Rosie's conduct, which pertained to actions that occurred more than 30 years earlier, involved events too remote in time and different in character to constitute actual notice to the District that Rosie would be engaged in a sexual relationship with a student in 2006 or posed a present danger to students.

We reach the same conclusion regarding the testimony of Alexandria Walls, who was a student of Rosie's in the late eighties or early nineties.[17] According to Alexandria, in 2005 she was paying a social visit at the home of her former teacher, Tony Tokish, who was then an Assistant Superintendent in the District, when she had the opportunity to tell him about Rosie's conduct toward her while she was in school. According to Alexandria, she reported that Rosie would stand in the hallway with his hands in his pockets and rock back and forth in a way that made the girls uncomfortable, he brushed her hair off her shoulder, touched her face to brush her hair away from her face and put his hands on her shoulders when she was sitting at her desk. The conduct mentioned to the Assistant Superintendent, however, occurred

---

**15.** Vicinelly testified that this file was later lost during a change in administration.

**16.** Apparently, Mr. Tiberi passed away before trial commenced.

**17.** Alexandria testified that she was born in 1976, graduated from high school in 1995, and had Rosie as teacher while she was in middle school, between the ages of 13 and 15 years old.

at least 13 years prior to reporting it.[18] Again, this information was too stale to constitute actual knowledge that Rosie would engage in a sexual relationship with a student or posed a substantial danger to students.

During trial, multiple witnesses testified regarding Rosie's inappropriate conduct as a softball coach. These incidents were closer in time to the Harden/Rosie relationship, but not all of the described conduct was brought to the attention of school officials. Celeste Tiberi, parent of softball player Monica Tiberi, testified that she met with Superintendent Vicinelly and Principal Tina Burns in the Spring of 2005 to report that, according to her daughter, Rosie stated to some of the players in the outfield that the field was "wet and mushy like sex." N.T. at 446 (February 14, 2012). She also reported that her daughter told her that a player walked into a room when Rosie was changing, and Rosie stated: "You know you like what you see," and invited the girl to stay. *Id.* at 452. Mrs. Tiberi noted that the school officials "documented everything," and she was given forms to be filled-out by the players; she explained to the officials that the players would probably decline to fill-out the forms because they feared repercussions. She stated, however, that Vicinelly told her that there would be no repercussions. Mrs. Tiberi believed that the forms needed to be completed for the matter to proceed further. Although Mrs. Tiberi did not hear anything further after that meeting, she later called Assistant Superintendent Mario Tiberi, her cousin by marriage, to report to him what she told Vicinelly and

to report that after she talked to Vicinelly, the other softball coach, Head Coach Brooks, reprimanded the girls and accused them of lying about Rosie. She also testified that Rosie was not at practice the day after she talked to Vicinelly.

During her testimony, Monica described inappropriate conduct by Rosie, to wit: he placed softballs in the pockets of his jacket and shook them "like referring to his testicles," N.T. at 414 (February 14, 2012); he made a comment after a rain about "the ground being wet and mushy like feeling like sex," *id.*; he made a comment about another player, "[s]omething about when she ran that she needed to put those away, referring to her breasts, because the boys were watching, looking," *id.* at 415; and he gave some players backrubs. She indicated, though, that she never told anyone about it other than the other coach, Coach Brooks, and her mother. She further testified that her mother was given forms for the players to fill-out regarding Rosie but none of the girls would fill them out. She noted that no one ever told her that she could report Rosie's conduct to the police or Children and Youth Services but admitted that she knew that she could have gone to the police if she felt strongly enough about it.

Similarly, Shirley Korsh,[19] president of the softball booster, a fundraising group, testified that she called Vicinelly during the pre-season[20] to relate the softball players' complaints about Rosie. However, due to evidentiary objections, Korsh never testified to what she told Vicinelly. She further stated that she called Vicinelly back one or two weeks later because Rosie

---

18. Tokish recalled the visit with Alexandria, indicating that she stopped by his house in the summer of 2005, after Rosie was no longer coaching softball. Tokish denied that Alexandria reported that Rosie touched her inappropriately.

19. Korsh's daughter also played softball but it was not clear from her testimony when her daughter played and whether she was coached by Rosie.

20. She was presumably referring to the 2005 softball season.

was still at practice and the girls were still complaining.[21] She noted that shortly after she spoke to Vicinelly the second time, Rosie was no longer at practice and did not attend the games. Mrs. Korsh further testified that she spoke to two school board members, Ms. Swaney and Mr. Bonni, regarding the girls' complaints; she recalled speaking to Mr. Bonni during the softball season but she could not recall when she spoke to Ms. Swaney, admitting that it may have been after Rosie resigned as coach. Ms. Korsh never specified what she told the board members about Rosie's conduct.

Crystal Chesslo, who played softball on Rosie's team in 2005, testified that Rosie told her that her eyes were beautiful and that they were very blue. She further testified that she never heard Rosie direct any inappropriate comments to other players, or act inappropriately towards the players. However, according to Crystal, the team would meet in a particular classroom every day after changing in the girls' locker room; the classroom contained an athletic room where their equipment was kept. Crystal related that on one occasion, she was the first person to reach the classroom and when she walked in, she saw Rosie in the equipment room wearing only "boxer, biker shorts" and when he saw her, he said, "you don't have to leave." N.T. at 655 (February 15, 2012). According to Crystal, she did not tell anyone other than a few girls, including Mrs. Korsh's daughter and Monica Tiberi; she did not tell her parents until after Rosie quit or was fired. She also noted that she mentioned the incident to Mr. Bonni, a board member, at one of the softball games; Rosie was still a coach at the time. She also testified that she told Mr. Bonni

that, "they needed to have a teacher and to have them there to watch him." *Id.* at 658.

According to Superintendent Vicinelly's testimony, Mrs. Tiberi met with him to pass along parental concerns conveyed to her about Rosie's inappropriate comments to the softball team. At that meeting, Mrs. Tiberi reported that Rosie purportedly said: (1) "this field looks like sex;" (2) "you better cover those things up [referring to breasts][;] [t]here [are] horny boys around here;" and (3) to a softball player who walked in while he was changing, "What? You never saw anything like this before?" N.T. at 1319 (February 21, 2012). Mrs. Tiberi also described the following conduct by Rosie: he stated during stretching exercises that he "felt vulnerable in [that] position;" he talked about balls, and on one occasion put a softball in his pants and asked if anyone wanted it; and hit the girls on the rear-end. Mrs. Tiberi indicated that the girls were afraid to be around Rosie. Vicinelly gave Mrs. Tiberi the Sexual Harassment Complaint forms and while she took them, she indicated that the girls wanted to remain anonymous and would probably decline to fill-out the forms. He assured Mrs. Tiberi that he would honor their anonymity as far as was possible in the process. Vicinelly then spoke to Mrs. Korsh that same day or the next day about similar concerns regarding Rosie.

While the exact timing is not altogether clear, Vicinelly, along with Administrative Assistant Tokish, promptly investigated the matter by talking to both Head Coach Brooks and Rosie. Coach Brooks told Vicinelly that he never observed any behavior similar to that which was described and discounted the reports of harassing behav-

---

**21.** She later testified on cross-examination that she couldn't recall exactly when she called the Superintendent the second time or exactly what she told him, other than she would have voiced her concerns about the girls.

ior. When he interviewed Rosie, Rosie also denied engaging in the reported conduct. Vicinelly advised Rosie that if the complaint forms were completed, a Title IX investigation would ensue. Rosie then resigned his coaching position.[22] His resignation was effective April 11, 2005, and formally accepted by the Board on April 20, 2005. When Vicinelly learned that Coach Brooks blamed the girls for what had happened to Rosie, Brooks was removed from his position by April 22. Vicinelly stated that he did not believe that he could have terminated Rosie as a teacher for his conduct as a coach and that sexual harassment, as opposed to sexual abuse, does not need to be reported to Children and Youth Services.

Finally, Harden adduced the expert testimony of William L. Bainbridge, Ph.D., a school standards evaluator. In his testimony, Dr. Bainbridge, based upon his review of Vicinelly's deposition, which was presumably taken during discovery, summarily stated that Vicinelly, as Superintendent, should have brought in a third person to conduct sexual abuse and harassment training in the District rather than conduct the training himself. In Dr. Bainbridge's opinion, the District's abuse/harassment training was lacking. He also referenced an "unbelievable paucity of documentation ... [he] did not see the [S]uperintendent or the Principal writing things down, putting them in the perpetrator's file.... [he] didn't see ... anything in that file to indicate parents had complaints ... every single parent complaint should go in the file." N.T. at 851 (February 16, 2012). According to Dr. Bainbridge, the parents' complaints about Rosie's behavior as a coach should have been reported to the police, who in most instances, will call Children and Youth Services. Accordingly, Dr. Bainbridge

criticized Vicinelly's failure to report Rosie to the police. Dr. Bainbridge also criticized the District generally, taking issue with its "substandard" performance reviews of Rosie, noting that they lacked "very thorough goals and objectives, avenues for improvement, specific kinds of information about his teaching and coaching and what he could do better...." *Id.* at 873. Moreover, Dr. Bainbridge opined that the fact that Rosie was unaware that one of his students had an Individual Education Plan demonstrated that the District was not following Pennsylvania and federal standards. Dr. Bainbridge ultimately opined that Superintendent Vicinelly was grossly negligent regarding his standard of care with mandatory reporting, staff training, documentation of complaints and evaluation of his staff, and most importantly, "he failed to contact the appropriate authorities who could have been available to help this child." *Id.* at 877. He further opined that the leadership of the school was more than deficient and a gross violation of children's rights had occurred. On cross-examination, Dr. Bainbridge admitted that while he believes that investigations of sexual harassment often lead to discovery of sexual abuse, in this case, any investigation of Rosie as a result of his conduct towards the softball players would not have revealed his relationship with Harden because that sexual relationship did not begin until almost one year later. Dr. Bainbridge also admitted on cross-examination that Vicinelly responded promptly to the parents' complaints about Rosie's behavior as a coach.

■ After a review of the evidence regarding Rosie's reported behavior toward his softball players, we conclude that while the conduct was completely inappropriate, crude, and unprofessional, the conduct it-

---

**22.** The athletic coaches are paid for their coaching duties.

self was too different from that complained of by Harden to have alerted the District to the fact that Rosie posed a substantial danger of engaging a student in a sexual relationship. Specifically, no one reported that Rosie was engaging in predatory behavior, there were no reports that he propositioned players, attempted to spend time with players outside of school hours or activities or meet them alone, texted or phoned individual players or otherwise sought to initiate or provoke a sexual relationship. In hindsight, it is easy to see a pattern of conduct that would cause grave concern that Rosie was morally unfit to teach children, and this hindsight perspective undoubtedly guided the jury's verdict. However, for purposes of the District's liability under Title IX, we must consider only the information known to responsible officials at the time they are charged with failing to act. Under this standard, we must conclude that the reports pertaining to his conduct as a coach fail, as a matter of law, to constitute actual notice to the District for purposes of Title IX liability in this case.[23]

■ Even if we were to find sufficient notice, Harden's Title IX claim would fail because the District's response to the reported behavior was not deliberately indif-ferent.[24] Vicinelly encouraged the girls (through Mrs. Tiberi and Mrs. Korsh) to file formal complaints, and even in the absence of written complaints, he promptly investigated the allegations and confronted Rosie. He further informed Rosie that a Title IX investigation would be conducted if the players filed a formal complaint, causing Rosie to resign his position. Vicinelly accepted the resignation even though Coach Brooks discounted the reports and Rosie denied the allegations. Furthermore, he promptly removed Brooks as a coach when he sanctioned the girls following Rosie's resignation. Vicinelly also testified that if Rosie had not resigned, he would have removed him from the coaching position. This response was not unreasonable and clearly did not reflect an intentional decision by school officials to overlook the discriminatory conduct suffered by members of the softball team. Moreover, in light of the fact that Harden was no longer a student in the school in which Rosie taught and that he was on sabbatical at the time of their relationship, it would seem clear that no further action by the District, such as firing Rosie from his middle school teaching position, would have protected Harden from contact with Rosie. As a matter of law, the undisputed evidence

---

23. Because of our conclusion, we leave to another day the issue of whether a report of discriminatory behavior to a single school board member is sufficient to constitute actual notice to an "appropriate person." Clearly, a single board member lacks authority to take corrective measures. *See* Section 514 of the Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 5–514 (stating, "[t]he *board* of school directors ... shall after due notice, giving the reasons therefor, and after hearing if demanded, have the right at any time to remove any of its officers, employes, or appointees for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct.") (emphasis added). *See*

*also* Section 1129 of the School Code, 24 P.S. § 11–1129 (requiring two-thirds vote of the board of school directors to discharge a professional employee); *Warren v. Reading Sch. Dist.*, 278 F.3d at 170 (observing that practical result of concluding that principal is not an "appropriate person" for purposes of notice would require a plaintiff to prove that members of the school's board, perhaps even a voting majority of the members, knew of the improper conduct).

24. Here, we focus on the District's response to reports concerning Rosie's coaching behavior. The District clearly acted promptly and appropriately when notified of Rosie's relationship with Harden.

does not demonstrate "an official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 291, 118 S.Ct. 1989.

The fact that Dr. Bainbridge was highly critical of the District in general, including its training methods and failure to report Rosie's coaching conduct to the police or Children and Youth Services, does not command a different conclusion.[25] The issue here is not whether the District used the best practices or even if it was negligent, but whether it violated the much stricter standards of Title IX. Consequently, while the court is reluctant to set aside the thoughtful and considered decision of the jury, we must do so because the undisputed trial evidence fails to satisfy Harden's burden of proof.

Based upon the foregoing, we reverse the trial court's grant of a new trial and remand for the entry of jnov for the School District.[26]

### *ORDER*

AND NOW, this 11th day of September, 2014, we REVERSE the order of the Court of Common Pleas of Fayette County granting a new trial in the above-captioned matter and REMAND for the entry of judgment in favor of Albert Gallatin School District (School District).

And further, Rebecca Harden's motion to strike the School District's Counterstatement of the Case is DENIED.

**CONCURRING OPINION BY Judge BROBSON.**

Upon review of the record in this matter, I am compelled to agree with the majority that the School District was entitled to a judgment in its favor notwithstanding the jury verdict, or JNOV. Although I believe the issue of whether the School District had sufficient notice to trigger Title IX liability is a close question, there is no record evidence upon which a jury could conclude that the School District acted with deliberate indifference in the face of the incidents involving Donald James Rosie (Rosie) and students outlined by the majority in its opinion. Perhaps the responses to each of those incidents, separately and collectively, fell short of what, in hindsight, would have been more appropriate or even would have prevented Rosie from later harming Rebecca Harden (Harden). But under prevailing law, like the majority, I cannot conclude that there is evidence in the record of deliberate indifference, such that Harden can prevail on her Title IX claim.

Rosie and those like him have taken so much more from us than can be compensated by jury verdicts. The days of allowing our children to roam their neighborhoods, to walk to school, or to play on a playground are gone, replaced with concern that a stranger's single kind word to a child may be the opening salvo to a heinous act. "Grooming" is a word that we no longer think of as involving personal hygiene. Although we are all importantly

**25.** We note that before the State Police reported the Harden/Rosie relationship to Vicinelly, none of the matters reported to district personnel amounted to a crime. Further, under the Child Protective Services Law, 23 Pa.C.S. §§ 6301–6386, sexual innuendo and sexually-oriented comments are not included in the definition of child abuse and need not be reported to the local county children and youth social service agency. *See* 23 Pa.C.S.

§§ 6303(a) (defining "sexual abuse or exploitation" and "child abuse"), 6311 (pertaining to persons required to report suspected child abuse), and 6313 (pertaining to reporting procedures).

**26.** Because the School District's counterstatement of the case has not affected the court's analysis of the legal issues, Harden's motion to strike that portion of the brief is denied.

more aware than we used to be of the dangers that our children, our most precious assets, face, we and they are also less innocent as a result and, sadly, less free.

Judge LEADBETTER joins in this concurring opinion.